```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FPL ENERGY MARCUS HOOK, L.P.    :       CIVIL ACTION
                                :
           v.                   :
                                :
STONE AND WEBSTER, INC.,        :
et al.                          :       NO. 05-2102
```

MEMORANDUM

Bartle, J.                                          October 7, 2005

       Before the court are the cross-motions of the parties for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

       Plaintiff FPL Energy Marcus Hook, L.P. ("FPL") alleges that it suffered in excess of $35,000,000 in damages because defendant Stone & Webster, Inc. ("Stone & Webster") has failed to employ proper engineering practices in the design and construction of a power plant for its use. Plaintiff also maintains that defendant, The Shaw Group, Inc. ("Shaw"), a corporation affiliated with Stone & Webster, breached its duty as guarantor of Stone & Webster's obligations. Defendants have filed a counterclaim which includes a count for a declaratory judgment that a Settlement and Release Agreement ("Settlement Agreement") bars certain claims of FPL.

       On July 10, 2001, FPL and Stone & Webster entered into an Engineering, Procurement, and Construction Agreement ("EPC Agreement") in which Stone & Webster agreed to design and

construct for FPL a 750 megawatt power plant in Marcus Hook, Pennsylvania.[1] The price was $442,000,000. Thereafter, as the work progressed, disputes arose between the parties, and on October 15, 2003, FPL and Stone & Webster entered into the Settlement Agreement.[2] The cross-motions for summary judgment revolve around its interpretation. Defendants maintain that under the Settlement Agreement, FPL waived its right, with certain enumerated exceptions, to bring any claims against them related to the EPC Agreement which arose on or before October 15, 2003. FPL maintains that only nine Controversies specifically identified in the Settlement Agreement were resolved.

The Settlement Agreement's recitals provide in relevant part:

> WHEREAS, various disputes and issues, as specifically set forth below (each a "Controversy", and collectively, the "Controversies"), have arisen between the Parties in connection with the Parties' respective obligations under the EPC Agreement; and
> WHEREAS, the Parties acknowledge the potential for costs, hazards, uncertainties and pitfalls relating to the Controversies and, as such desire to enter into this Settlement Agreement in order to address and lay to rest the Controversies in order to avoid such costs and risks; and
> WHEREAS, the Parties wish to resolve all disputes and issues between them on the terms and conditions set forth below;

---

1. Shaw executed a separate Guaranty Agreement in favor of FPL whereby it guaranteed the obligations of Stone & Webster under the EPC Agreement.

2. Although defendant Shaw was not a signatory to the Settlement Agreement, it was binding upon and inured to the benefit of affiliates of Stone & Webster, such as Shaw.

-2-

>     NOW, THEREFORE, in consideration of the
> premises [sic] and the releases,
> representations, covenants and obligations
> contained herein, and intending to be bound,
> [FPL] and [Stone &Webster] agree as follows.

Settlement Agreement, at 1-2.

The operative sections of the Settlement Agreement then follow.[3]  Article 2 begins:  "The Controversies outstanding between the Parties, which are currently unresolved but which the parties propose to resolve pursuant to this Settlement Agreement, are as follows."  Settlement Agreement, Art. 2.  Nine specific unresolved Controversies between FPL and Stone & Webster are then identified.  They are described under the headings:  (1) Control; (2) Change Orders; (3) Surplus Piping Material; (4) Unit Rate; (5) Letter of Credit; (6) Schedule Bonus; (7) Liquidated Damages; (8) Project Executive; and (9) Additional Fees and Incentives.

Article 3, entitled, "Resolution of the Disputes and Issues," provides that "the Parties hereby agree to fully and unconditionally resolve the Controversies on the terms listed below."  Settlement Agreement, Art. 3.  It proceeds to set forth their agreement as to how each of the nine Controversies is to be resolved.  Some of the Controversies are settled by imposing certain future obligations on the parties.  Among other things, FPL is given significant control and oversight over the project.  See Settlement Agreement, Art. 3, ¶ A.

---

3. Article 1 is entitled "Definitions."  It simply states, "All capitalized terms which are not other wise [sic] defined in this Settlement Agreement shall have the meanings given to them pursuant to the EPC Agreement."

Article 4, captioned "Waivers and Releases," reads in relevant part:

> <u>Release of Claims by Owner [FPL]</u>:
> Subject only to the Reservation of Rights in the next paragraph of this Article 4B, as of the Effective Date [October 15, 2003], Owner [FPL], intending to be legally bound on behalf of itself, its parents, subsidiaries, affiliates, successors, predecessors, assigns (past, present and future), directors, officers, agents, attorneys, insurers, employees, stockholders, and representatives, and their decedents, dependents, heirs, executors, administrators, trustees, and guardians, ABSOLUTELY, IRREVOCABLY, AND UNCONDITIONALLY FULLY AND FOREVER ACQUITS, RELEASES, AND DISCHARGES CONTRACTOR [Stone & Webster], its parents, subsidiaries, affiliates, successors, predecessors, assigns (past, present and future), directors, officers, agents, attorneys, insurers, employees, stockholders, and representatives, from any and all claims, causes of action, demands, obligations, charges, complaints, controversies, damages, liabilities, costs, expenses, judgments, guarantees, agreements, or defaults of every and any nature, relating to or arising under the EPC Agreement, whether in law or equity and whether arising in contract (including breach), tort or otherwise, and irrespective of fault, negligence or strict liability, which Owner [FPL] may have had, or may now have, before or as of the Effective Date [October 15, 2003].
>
> <u>Reservation of Owner's Rights</u>:
> The preceding paragraph shall not apply to (i) Contractor's obligations contained in this Settlement Agreement, or (ii) except to the extent specifically addressed herein, the obligations or liabilities of Contractor, including but not limited to Contractor's obligations and liabilities with respect to completion of (a) all Work required to be performed through Final Acceptance, (b) all project guarantees under Article 11, warranties and guarantees under Article 12 and Section 18.16, (c) indemnities under Article 16 and Section 18.16, and (d)

>      confidentiality under Article 18 thereof.
>      Notwithstanding the foregoing, nothing in
>      this Agreement shall preclude Owner from
>      (i) fully defending itself against and/or
>      (ii) seeking indemnity and/or contribution
>      from Contractor (or any other party)
>      in the event that any action, claim or
>      arbitration demand is filed against Owner in
>      connection with the Plant or the Work in a
>      manner consistent with the EPC Contract.[4]

Settlement Agreement, Art. 4, ¶ B.

Finally, Article 5, with the heading "Covenants Not to Sue," states:

>      It is the intent of the Parties that the
>      consideration received by each pursuant to
>      this Settlement Agreement satisfies and
>      finally resolves the Controversies indicated
>      herein, and it is expressly intended and
>      agreed that the releasing Party shall not
>      assert against the released Party, whether on
>      its behalf or on behalf of a party not a
>      signatory to this Agreement, any future
>      claims based on the past conduct, act, or
>      omission encompassed in such releasing
>      Party's release set forth in and of the
>      Settlement Agreement, except for non-payment
>      of any Reimbursable Costs and Fees; provided
>      that such Reimbursable Costs and Fees are not
>      the result of any Changes or Change Orders as
>      resolved pursuant to Article 3B of this
>      Agreement.

Settlement Agreement, Art. 5.

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Fed. R. Civ. P. 56(c).  The Settlement Agreement states and the parties agree that it is governed by New York law.  Settlement Agreement, Art. 7, ¶ B.

---

4.  There are similar provisions which release FPL.

"Releases are contracts to be interpreted in accordance with principles of contract law."  <u>Zilinskas v. Westinghouse Elec. Corp.</u>, 669 N.Y.S.2d 703, 705 (N.Y. App. Div. 1998).  Generally, a clear and unambiguous contract is to be enforced according to its terms, without reference to extrinsic evidence as to its meaning.  <u>W.W.W. Assoc., Inc. v. Giancontieri</u>, 566 N.E.2d 639, 642 (N.Y. 1990).  The clarity of a contract is a question of law for the courts, and a contract must be read as a whole to determine whether it is unambiguous.  <u>Id.</u>  "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"  <u>Greenfield v. Philles Records, Inc.</u>, 780 N.E.2d 166, 170-71 (N.Y. 2002) (brackets in original).

      We need look no further than the four corners of the Settlement Agreement itself to determine the scope of the release.  The wording of the document is clear and unambiguous.  The Settlement Agreement first provides that nine specific Controversies between FPL and Stone & Webster are being settled.  However, the Settlement Agreement encompasses much more.  Subject only to its "Reservation of Owner's Rights" paragraph, Article 4 releases Stone & Webster from:

> [<u>A</u>]<u>ny and all</u> claims, causes of action, demands, obligations, charges, complaints, controversies, damages, liabilities, costs, expenses, judgments, guarantees, agreements, or defaults of every and any nature, relating to or arising under the EPC Agreement,

>       whether in law or equity and whether arising
>       in contract (including breach), tort or
>       otherwise, and irrespective of fault,
>       negligence or strict liability, which Owner
>       <u>may have had</u>, <u>or may now have</u>, before or as
>       of the Effective Date."

Settlement Agreement, Art. 4, ¶ B (emphasis added).  This language could hardly be more expansive.  "Controversies" is simply one of many terms used.  The claims released were not only those known, that is the nine Controversies, but also those claims which FPL "may have had or may now have."  FPL's reading of the Settlement Agreement limiting its effect to the nine Controversies specifically described in Articles 2 and 3 would render the above-quoted portion of Article 4 virtually meaningless.  Courts "should not 'adopt an interpretation' which will operate to leave a 'provision of a contract ... without force and effect.'"  Laba v. Carey, 277 N.E.2d 641, 644 (N.Y. 1971).

      The "Reservation of Owner's Rights" paragraph in Article 4 does not help FPL.  It simply is a limited carved-out provision, which excludes certain enumerated matters from the release language.  The "Reservation of Owner's Rights" paragraph makes explicit the obvious, that the obligations of the parties set forth in the Settlement Agreement itself are not released.  The paragraph also clarifies that the Settlement Agreement does not release Stone & Webster from its obligations under the EPC Agreement going forward as it completes its work on the power plant.  In addition, it preserves warranty, guarantee, indemnity, and confidentiality provisions in the EPC Agreement.  None of the

"Reservations of Owner's Rights" is inconsistent with the notion that except for specifically identified carve-outs all disputes and claims arising on or before October 15, 2003, the date of the Settlement Agreement, are released.

The recitals, on which FPL relies, do not undermine this result. They provide not only that "the Parties ... desire to enter into this Settlement Agreement in order to address and lay to rest the Controversies," but also that "the Parties wish to resolve <u>all disputes and issues between them</u> on the terms and conditions set forth below." Settlement Agreement, at 1-2 (emphasis added). Thus, the recitals include more than the nine Controversies.

Finally, an examination of Article 5, which is entitled "Covenants Not to Sue," further illustrates the broad scope of the release. In addition to stating that the "Settlement Agreement satisfies and finally resolves the Controversies indicated herein," it recites that with certain specified exceptions "it is expressly intended and agreed that the releasing Party shall not assert against the released Party ... any future claims based on the past conduct, act, or omission encompassed in such releasing Party's release ...." This is totally inconsistent with the notion that only the nine specified Controversies are being released.

While the initial impetus for the Settlement Agreement may have been the existence of the nine Controversies, the parties' ultimate focus was not so narrow. The Settlement

-8-

Agreement concerned a complex engineering project.  Not surprisingly, the language used by the parties wiped the slate clean except as explicitly noted and allows the parties to move forward without being bogged down by litigation over past events or breaches, whether then known or unknown.  See Murphy v. City of New York, 83 N.E. 39 (N.Y. 1907); Herman v. Malamed, 487 N.Y.S.2d 791, 793 (N.Y. App. Div. 1985).

Both parties have presented extrinsic evidence of their intent, none of which is being considered.  The terms of the Settlement Agreement, as previously noted, are clear and unambiguous.  Thus, we limit our consideration to what is contained within the four corners of the document itself.  W.W.W. Assoc., 566 N.E.2d at 642.  The parties to the Settlement Agreement are large, sophisticated entities, represented at all times by counsel.  The underlying engineering project involved hundreds of millions of dollars.  Had the parties wanted to confine the Settlement Agreement to the nine Controversies, their counsel certainly knew how to express that intent in writing.  In sum, except as specifically carved out in the Settlement Agreement, FPL released the defendants from all possible claims which FPL may have had "relating to or arising under the EPC Agreement" on or before October 15, 2003.

Accordingly, we will grant the motion of defendants for partial summary judgment and deny the cross-motion of FPL for partial summary judgment.

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

FPL ENERGY MARCUS HOOK, L.P.   :   CIVIL ACTION
                               :
         v.                    :
                               :
STONE AND WEBSTER, INC.,       :
et al.                         :   NO. 05-2102

<u>ORDER</u>

AND NOW, this 7th day of October, 2005, it is hereby ORDERED that:

(1) the motion of the defendants Stone & Webster, Inc. and The Shaw Group, Inc. for partial summary judgment is GRANTED;

(2) the motion of the plaintiff FPL Energy Marcus Hook, L.P. for partial summary judgment is DENIED; and

(3) judgment is entered in favor of the defendants Stone & Webster, Inc. and The Shaw Group, Inc. and against the plaintiff FPL Energy Marcus Hook, L.P. on its claim for declaratory relief with respect to the scope of the Settlement and Release Agreement dated July 10, 2001. Any and all claims that plaintiff FPL Energy Marcus Hook, L.P. may have had against the defendants Stone & Webster, Inc. and The Shaw Group, Inc. relating to or arising under the Engineering, Procurement, and Construction Agreement on or before October 15, 2003 are barred, except as specifically referenced in said Settlement and Release Agreement.

                              BY THE COURT:


                              /s/ Harvey Bartle III
                                                     J.